IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PROTECTIVE LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>WELLS FARGO BANK, N.A., as Securities Intermediary,<br><br>    Defendant. | C.A. No. _____ |

# COMPLAINT

Plaintiff, Protective Life Insurance Company ("Protective"), files and asserts this Complaint against Defendant, Wells Fargo Bank, N.A., as Securities Intermediary ("Wells Fargo"), and in support thereof, alleges and says:

## INTRODUCTION

1. This action involves a stranger-originated life insurance ("STOLI") scheme operated in and through the State of Delaware and a particular STOLI policy that was manufactured on the life of Thomas Nixon, who, on information and belief, was induced to lend his life to investors who procured a $5 million dollar policy (the "Policy") from Protective Life Insurance Company ("Protective"), to illegally wager on Mr. Nixon's life, in violation of Delaware's Constitution and public policy against human life wagering.

## PARTIES

2. Protective is a life insurance company incorporated under the laws of Tennessee, with its principal place of business located at an address in the state of Alabama. Protective is a citizen of the states of Tennessee and Alabama.

3. Wells Fargo is a National Banking Association organized and existing under federal law with its Articles of Association stating its main office is located at an address in the state of South Dakota. Wells Fargo is a citizen of South Dakota for purposes of diversity jurisdiction. Wells Fargo is named as a party to this action solely because, as set forth below, in its capacity as Securities Intermediary, it claims to be the owner and beneficiary of the Policy (as defined herein).

**JURISDICTION AND VENUE**

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiff, a citizen of Tennessee and Alabama, and the Defendant, a citizen of South Dakota.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Delaware.

**FACTS COMMON TO ALL CLAIMS**

6. As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies which are procured as a wager on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate the state's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id*.

7. Although speculators have been around for hundreds of years, never has the problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance

policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

8. It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id*.

9. On information and belief, one such STOLI investor was Deutsche Bank AG ("Deutsche Bank"), a German multinational investment bank and financial services company headquartered in Frankfurt, Germany.

10. While there are a variety of STOLI schemes that were orchestrated by various investors in the mid-2000s, Deutsche Bank's STOLI scheme was based on what is known in the STOLI industry as a beneficial interest transfer deal. Under this type of STOLI scheme, life insurance policies are procured through sham trusts using form trust agreements. To conceal from the insurance company the fact that the policy is STOLI, the policy itself generally remains in the name of the sham trust. Meanwhile, the beneficial interest in that sham trust is transferred behind the scenes to an investor, who then effectively owns the policy.

11. In Delaware and other places, these STOLI transactions violate constitutional bans on wagering and insurable interest laws and they take advantage of senior citizens and otherwise distort the proper use of life insurance—which is to provide actual protection to an

insured's family or others with an insurable interest—into a cash machine whereby strangers to the insured are actually more interested in seeing the insured dead than alive.

12. On information and belief, to operate its beneficial interest STOLI scheme, Deutsche Bank created numerous Delaware statutory trusts in the early to mid-2000s, each operating out of Wilmington, Delaware, as a so-called "Accumulation Trust."

13. Deutsche Bank's Accumulation Trusts include "The GIII Accumulation Trust," which was the Deutsche Bank Accumulation Trust specifically at issue in *Price Dawe*, as well as over a dozen other similar trusts, with names including: "The Life Accumulation Trust;" "The Life Accumulation Trust II" and so on through and including "Life Accumulation Trust XI;" "The CAP Accumulation Trust;" "The GPR Accumulation Trust;" "The PEB Accumulation Trust;" and "The SLA Accumulation Trust."

14. On information and belief, the beneficial owner of these Accumulation Trusts was a wholly-owned Deutsche Bank entity called DBAH Capital, LLC ("DBAH"), a Delaware limited liability company with its principal place of business in Wilmington, Delaware. According the Deutsche Bank's public financial disclosures, DBAH stands for "Deutsche Bank America Holdings Corp." and DBAH is operated by certain members of Deutsche Bank's senior management team.

15. Deutsche Bank's Accumulation Trusts were, on information and belief, nothing more than shell entities used by Deutsche Bank to manufacture and procure STOLI policies that were either kept by Deutsche Bank or its affiliates, or resold to other STOLI investors.

16. On information and belief, Deutsche Bank was assisted in its efforts by other STOLI promoters who acted as Deutsche Bank's agents, including, on information and belief: (i) Park Venture Advisors, LLC ("Park Venture"), a Delaware limited liability company with a

registered agent in Wilmington, Delaware; (ii) Louis Kreisberg and Grant Heller, individuals who are believed to have owned and/or directed Park Venture at the relevant time; and (iii) Joseph Capital, LLC ("Joseph Capital"), a Delaware limited liability company with a registered agent in Wilmington, Delaware which advertises itself as an investment bank headquartered in New York, New York, and claims to be run by a management team comprised of bankers from Deutsche Bank and other global financial institutions (collectively, "Deutsche Bank's Agents").

17.     On information and belief, Deutsche Bank's Accumulation Trust STOLI scheme operated as follows:

- Deutsche Bank, through Deutsche Bank's Agents, established a nationwide network of rogue insurance producers, who assisted them by, among other things, identifying senior citizens meeting their investment criteria and causing those seniors to become involved in the STOLI transactions they were orchestrating.

- Deutsche Bank, through Deutsche Bank's Agents, would have senior citizens like Mr. Nixon sign boilerplate trust documents to create Delaware statutory trusts in the seniors' names.

- Contrary to the insurable interest requirement set forth by the Delaware Constitution, the Delaware Insurance Code, and the Delaware Supreme Court in *Price Dawe*, these Delaware statutory trusts were minimally funded and were created so that Deutsche Bank could use these trusts to apply for, purchase, hold and/or transfer large life insurance policies on the lives of senior citizens.

- Prior to, or shortly after, issuance of a policy, Deutsche Bank, through its Accumulation Trusts, received the sole beneficial interest in each Delaware statutory trust it created, and thus the interest in every policy owned by such trusts.

- To induce senior citizens like Mr. Nixon to permit Deutsche Bank to carry out its STOLI program, Deutsche Bank, through Deutsche Bank's Agents and its Accumulation Trusts, paid, or promised to pay, the insureds financial compensation, in exchange for which Deutsche Bank, through the Accumulation Trusts, became the beneficial owner of the trusts used to create the policies.

- Deutsche Bank, and not the insureds like Mr. Nixon, paid all of the premiums necessary to procure the policies that were owned by such trusts.

18. Thus, on information and belief, Deutsche Bank operated an illegal STOLI scheme that created life insurance policies lacking insurable interest and that were nothing more than mere wagers, including on the life of Mr. Nixon who, at the time the Policy was procured, was a 73 year-old-man living in Pittsburgh, Pennsylvania.

19. Upon information and belief, in or around 2007, Deutsche Bank, by way of its agents Karl Ohrman and Alison Simmons, used Mr. Nixon to procure the Policy—not for Mr. Nixon or his family or for a legitimate insurance purpose—but rather for Deutsche Bank's own purposes.

20. On information and belief, consistent with Deutsche Bank's STOLI program, Mr. Nixon signed a series of non-negotiable, boilerplate documents, including trust agreements used to create the Thomas Nixon 2007 Insurance Trust (the "Insurance Trust") as a Delaware statutory trust with a Delaware trustee, Christiana Bank & Trust Company, a Delaware corporation located in Greenville, Delaware.

21. The Insurance Trust was a sham, however, because on information and belief it was minimally funded and created as a means to conceal the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Insurance Trust lacked any valid insurable interest in Mr. Nixon's life.

22. Nonetheless, using this sham trust arrangement, Deutsche Bank—acting through Deutsche Bank's Agents and Accumulation Trusts—caused the Policy to be applied for, issued by Protective, and delivered in Delaware to the Delaware trustee of the Insurance Trust.

23. On information and belief, consistent with Deutsche Bank's Accumulation Trust STOLI scheme, the beneficial interest in the Insurance Trust was transferred to one of Deutsche

Bank's Accumulation Trusts so that the Policy was effectively owned and controlled by Deutsche Bank itself.

24. The Policy remained in the name of the Insurance Trust until September 2015, when Protective received a request to change the owner and beneficiary of the Policy from the Insurance Trust to Wells Fargo, as Securities Intermediary.

25. Wells Fargo did not disclose to Protective the name of the person or entity for whom it was serving as Securities Intermediary, but Protective subsequently received premium payments on the Policy from an entity known as Carlisle-Luxembourg Life Fund and later from an entity known as Hamildak Designated Activities Company.

26. On July 26, 2021, Mr. Nixon passed away.

27. Wells Fargo subsequently made a claim for the Policy's death benefit.

28. Having investigated the Policy, Protective now believes the Policy was procured through a STOLI scheme and is thus void *ab initio*.

**FIRST CAUSE OF ACTION**

**DECLARATORY JUDGMENT – ILLEGAL HUMAN LIFE WAGERING CONTRACT**

46. Protective hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

47. The Policy was applied for and signed in Delaware by a Delaware statutory trust, as owner and beneficiary of the Policy. The Policy was then actually delivered to the trustee of the Insurance Trust, Christiana Bank & Trust Company, a Delaware corporation, at its offices in Greenville, Delaware. The Policy is governed by Delaware law.

48. The Delaware Constitution provides that "[a]ll forms of gambling are prohibited in this State except [those explicitly set forth in the statute]." Del. Const. Art. II, § 17. Moreover, the Delaware Supreme Court in *Price Dawe* addressed the issues associated with life

insurance policies used to wager on the death of insureds and has held that, under Delaware law, such policies are mere wagering contracts and are void *ab initio*.[1]

49.  As set forth herein, the Policy was, from the outset, procured by third parties and intended as a wager on the life of Mr. Nixon.  Whether Mr. Nixon knew the details of this scheme or his identity was merely used as an instrumentality to procure the Policy, stranger investors were wagering on Mr. Nixon's life and hoping to trigger a secondary market cash-in on the Policy's $5 million death benefit.

50.  Accordingly, Protective seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated the Delaware Constitution and the public policy of Delaware, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.

## SECOND CAUSE OF ACTION

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

51.  Protective hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

52.  The Policy was intentionally structured to be a "trust-owned insurance policy" as defined by Delaware's insurable interest statute, 18 *Del. C.* § 2704(e)(4).  Because the Policy was delivered to the place of business of the trustee of the Trust, Christiana Bank & Trust Company, at its offices in Greenville, Delaware, the existence of an insurable interest "shall be governed by [Delaware's insurable interest statute] without regard to [the] insured's state of residency or location." 18 *Del. C.* § 2704(g).

---

[1] Indeed, the policy at issue in *Price Dawe* was an Accumulation Trust policy.

53. Under Delaware law, only a valid and legitimate insurance trust can have a valid insurable interest in the life of the insured. *See* 18 *Del. C.* § 2704(c)(5).

54. However, here, because the Trust was an illegitimate cover for the wager on Mr. Nixon's life, the Trust lacked any insurable interest in the life of Mr. Nixon. Accordingly, no insurable interest existed at the time of issuance of the Policy, and the Policy is void *ab initio* for lack of insurable interest.

55. Additionally, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Accordingly, the Policy is void *ab initio* for lack of an insurable interest.

56. Therefore, Protective seeks, and is entitled to, a declaratory judgment that the Policy lacked insurable interest because it was procured by and for the benefit of strangers without any insurable interest under Delaware law.

WHEREFORE, Protective respectfully requests the entry of an Order by this Court as follows:

A. Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Mr. Nixon;

B. Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

C. Declaring that because the Policy is void *ab initio* it never existed;

D. Declaring that because the Policy is void *ab initio* the Court will leave the parties to this illegal contract as it finds them, thus permitting Protective to retain some or all of the premiums paid on the Policy;

E.   Awarding Protective attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

F.   Awarding Protective any further relief this Court deems appropriate.

DATED:  October 7, 2021                COZEN O'CONNOR P.C.

*/s/ Kaan Ekiner*
Kaan Ekiner (No. 5607)
1201 North Market Street, Ste. 1001
Wilmington, DE  19801
Phone: 302-295-2046
Fax: 302-250-4356
kekiner@cozen.com

Michael J. Miller (*pro hac vice to be filed*)
Gregory J. Star (*pro hac vice to be filed*)
Joseph Kelleher *(pro hac vice to be filed)*
1650 Market St., Suite 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff,*
*Protective Life Insurance Company*